UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| Scott Nadeau,<br><br>    Plaintiff,<br><br>v.<br><br>City of Golden Valley, Shep Harris, in his individual and official capacities, Tim Cruikshank, in his individual and official capacities, Jessie Smith, in her individual and official capacities<br><br>    Defendants. | Court File No._____<br><br>**COMPLAINT** |

Plaintiff, for his Complaint, allege and state as follows:

## PARTIES

1. Plaintiff Scott Nadeau ("Plaintiff" or "Nadeau") is a resident of Ramsey County, Minnesota.

2. Defendant City of Golden Valley ("City" or "Golden Valley") is located in Hennepin County, Minnesota.

3. Defendant Shep Harris ("Harris") is the mayor of Golden Valley and a resident of Hennepin County, Minnesota.

4. Defendant Tim Cruikshank ("Cruikshank") is the City Manager of Golden Valley, and a resident of Minnesota.

5. Jessie Smith ("Smith") was a member of the City of Golden Valley PEACE Commission and a resident of Minnesota.

6. All actions complained of herein occurred while Plaintiff was employed by the City.

7. The jurisdiction of this Court is appropriate as there is a Federal Question.

## FACTS

### MUNICIPAL BACKGROUND

8. The City of Golden Valley is a statutory "Plan B" City pursuant to Minn. Stat.

1

§ 412.541.

9. As a "Plan B" City, the city manager exercises control over all departments and divisions of the City.

10. As a "Plan B" City, Golden Valley city councilmembers, including its mayor, Defendant Harris, are prohibited from dictating the appointment of any person to office or employment by the manager.

11. As a "Plan B" City, Defendant Harris is prohibited from interfering in any way with the manager or preventing the manager from exercising judgment in appointment of officers and employees.

12. As a "Plan B" City, Defendant Harris is required to deal with and control the administrative service solely through Defendant Cruikshank.

## PLAINTIFF'S BACKGROUND

13. Plaintiff Nadeau began his career in Law Enforcement at Brooklyn Center as a Police Officer in 1987.

14. Plaintiff Nadeau rose through the ranks at Brooklyn Center, promoted to Detective in September 1998, Sergeant in February 2002, and Commander in January 2005.

15. While at Brooklyn Center, he served as a SWAT team member, Field Training Officer, Hostage Negotiator, Supervisor of Patrol, Supervisor of Proactive Policing Team, Supervisor of Detectives, and as the Commander of Investigations and Professional Standards.

16. Plaintiff Nadeau was hired as Chief of Police at Columbia Heights in March 2008.

17. During his tenure as the Chief of Police at Columbia Heights, crime rates reduced by over fifty percent, he received an award for community policing from the International Association of Chiefs of Police, and he served as the President of the Anoka County Chiefs of Police.

18. Plaintiff Nadeau received multiple awards for community policing from local, regional, state, and international bodies.

19. He was regarded as a subject matter expert who instructed in in-service, university, and professional conferences.

20. His work in diversifying workforces and building relationships with diverse communities led him to instruct and lecture on the topic in the state and nationally.

21. In July 2017, Plaintiff Nadeau was hired as the Chief of Police and Public Safety Director for the City of Maplewood.

22. While at Maplewood, Plaintiff Nadeau supervised the Police Department, Fire Department, and Emergency Medical Services.

23. In his role as a Public Safety Director, he continued his work to diversify public safety and continued to lead award winning efforts in community policing, working in diverse communities, and workforce diversity.

24. Plaintiff Nadeau retired as the Director of Public Safety in Maplewood in June 2021.

## GOLDEN VALLEY POLICE DEPARTMENT BACKGROUND

25. Earlier in 2021, while Jason Sturgis was the Golden Valley Chief of Police, a Commander position in the Police Department was posted as vacant.

26. Chief Sturgis believed there was a Sergeant, a white male, that was prepared to hold the position.

27. The City originally intended on hiring a search firm to help with the search. To that end, the City advertised a request for proposals ("RFP") to hire a search firm.

28. In the RFP, an emphasis was placed on finding a non-white candidate.

29. After meeting with a firm responding to the RFP, the City decided to conduct the search on its own.

30. The City originally set the Police Commander requirements as: rank of Sergeant or above, investigative experience, a bachelor's year degree, preference for a master's degree, preference for previous supervisory experience, and preference for command and staff school completion.

31. After two weeks, the City had received a number of applications, including the white male Sergeant from Golden Valley Police Department. However, the City was not satisfied with the racial makeup of the applicants that met the minimum qualifications.

32. The City then removed the educational component. After reducing the qualification standards, the City failed to notify any of the members of the Police Department of the change.

33. Consequently, current supervisors with the Golden Valley Police Department were not notified that they now met minimum qualifications for the commander position. These other supervisors were white.

34. One new individual applied after the City changed the qualification standards, Alice White.

35. Alice White is an African-American female, former Minneapolis Police Sergeant with limited supervisory experience, no investigatory experience, and no bachelor's degree.

36. Defendant Cruikshank, stated that the City of Golden Valley needed to hire African-American people to get ahead of the problem with policing.

37. The City intentionally sought black candidates over white candidates in the Police Department.

38. Alice White was appointed to the position of commander over the objection of then Chief Jason Sturgis.

39. Chief Jason Sturgis retired in August 2021.

40. Golden Valley Police Department was in disarray upon Chief Sturgis's departure.

41. Over the following two-month period, Golden Valley Police Department had a 45% turnover of its workforce.

42. The turnover was due in large part to lack of support from the City and its elected officials, particularly on issues and statements involving policing and race.

## CHIEF OF POLICE SEARCH

43. Plaintiff Nadeau was contacted by the City, requested to apply for the interim Chief of Police at Golden Valley, and offered the job shortly thereafter.

44. Plaintiff Nadeau agreed to serve as interim Chief of Police and planned to hold the position for four to six months.

45. The City began a search for the permanent Chief of Police through a recruiting agency America's Best Strategic Securities Group.

46. Plaintiff Nadeau diligently worked to restore trust and build relationships both internally within the Police Department, between the Police Department and appointed and elected leaders of the City, and externally between the Police Department and the members of the Public.

47. Plaintiff Nadeau's work was recognized by both police employees and the City's elected and administrative leaders as providing valuable and tangible results.

48. Plaintiff Nadeau re-established morale in the Department and positively impacted the relationship between the community and the Police Department.

49. Both Cruikshank and the recruiter hired by the City—Jesus "Eddie" Campa—requested Plaintiff Nadeau apply to be the permanent Chief of Police.

50. In December 2021, Plaintiff Nadeau applied for the position of Chief of Police.

51. As a part of the search process, there were four panel interviews.

52. The panel interviews included interviews with City Staff, Department Heads, members of the cities' police commission known as the PEACE commission, members of the "PRIME", a group representing African Americans, and "Valley Allies", a group representing progressive causes and LGBTQ community, select community members, and Officers with the Golden Valley Police Department.

53. The feedback provided to Plaintiff Nadeau by the panelists that took part in the panel interviews was that he was ranked as the leading candidate from each panel.

54. Three finalists—Plaintiff Nadeau, Virgil Greene, and John Franklyn—were interviewed by a separate panel.

55. The final panel was comprised of Defendant Cruikshank, the Assistant City Manager, Defendant Harris, Tray Gladney representing the PRIME group and PEACE Commission, and City Councilmember Gillian Rosenquist.

56. One individual whom chaired one of the four initial hiring panels, Defendant Smith a representative of the PRIME group, Valley Allies, and the PEACE Commission, publicly posted a request for the public to lobby for either of the two black finalists.

57. Defendant Smith also publicly requested the public to find negative information about Plaintiff Nadeau.

58. Defendant Smith conspired with Defendants to violate Plaintiff's civil rights.

59. The Union Stewards representing the rank and file of the Golden Valley Police Department submitted a letter of support for Plaintiff Nadeau to the final panel after the Police Officers had an opportunity to meet and interview all of the finalists.

60. As of March 1, 2022, there were two remaining finalists for Chief of Police – Plaintiff and Virgil Green.

61. As of March 1, 2022, Virgil Green was not licensed as a Peace Officer in the State of Minnesota.

62. Virgil Green was previously terminated as the Chief of Police in Spencer, Oklahoma.

63. Virgil Green was previously terminated as Chief of Police for Helena-West Helena, Arkansas.

64. On March 1, 2022, Defendant Harris contacted members of the media requesting them to observe that evening's City Council meeting.

65. At the March 1, 2022 City Council meeting, Defendant Harris made a series of statements during the Council Comments portion of the meeting.

66. At the March 1, 2022 City Council meeting, Defendant Smith also made a series of comments encouraging the City to engage in race based hiring.

67. Those comments included claiming that the Golden Valley Police Department was racist, corrupt, and called for an investigation into the Police Department.

68. The allegations made by Defendant Harris included accusations of unethical and criminal activity by Plaintiff Nadeau.

69. Defendant Harris went on to state that the Mayor and City Council panel will make the final decision about the Chief of Police in violation of State law.

70. Defendant Harris acknowledged that, "the decision is up to the City Manager. That is state law. But in practice we created a community process. If we started that way, we should finish that way." Golden Valley City Council Meeting, March 1, 2022. https://nwsccc-goldenvalley.granicus.com/player/clip/1187?&redirect=true

71. Defendant Harris then stated he endorsed Virgil Green.

72. Defendant Harris completed his comments by calling for an investigation into the Golden Valley Police Department.

73. Defendant Harris's comments amounted to discharging Plaintiff Nadeau from his position.

74. Defendant Harris contacted media members prior to the meeting in an attempt to maximize publication of his statements.

75. Also at the meeting were Defendant Cruikshank, the City Attorney, and the rest of the City Council.

76. None of the other City Officials present corrected, challenged, or responded in any way to Defendant Harris's statements.

77. That evening, Defendant Cruikshank spoke with Plaintiff Nadeau and apologized to Plaintiff Nadeau saying Defendant Harris's comments and actions were unfair.

78. Defendant Cruikshank was upset and said he was contemplating resigning, saying he could not believe that Defendant Harris failed to trust that Defendant Cruikshank could run a legitimate hiring process and apologized to Plaintiff Nadeau as it was unfair.

79. Having no other option, Plaintiff Nadeau officially resigned the following day, informing Defendant Cruikshank that Plaintiff Nadeau had no choice based upon the comments at the meeting.

80. Specifically, Plaintiff Nadeau noted that given Defendant Harris's comments, unchallenged by the City Attorney, Councilmembers, and the Defendant Cruikshank, it was clear that Plaintiff Nadeau was terminated, unwanted as the Chief of Police, and that Plaintiff Nadeau's reputation, integrity, and professional credibility were publicly questioned.

81. On March 8, 2022, the City Council held a workshop where members responded to Defendant Harris's statements and informed him that his actions were in violation of State Law.

82. Despite acknowledging that the City violated State Law at the March 8, 2022 meeting, the City moved forward with the finalist chosen and endorsed by Defendant Harris, Virgil Green.

83. While the goal of achieving diversity in leadership has recognized value, terminating the high performing, extremely experienced, and proven Police Chief Plaintiff Nadeau with no justification or purpose other than to achieve diversity constitutes an adverse employment action based on race and/or gender.

84. As a result of Defendant Harris's mass publication, accusing Members of the Police Department and Plaintiff Nadeau of criminal wrongdoing, negligent supervision, racism, and corruption will have serious detrimental impacts on Plaintiff Nadeau's career in law enforcement or any other career.

## COUNT I – TITLE VII

85. Plaintiffs includes by reference all other paragraphs stated in this Complaint

86. Defendants' termination of Plaintiff to achieve racial diversity constituted employment discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. 2000e, *et seq.*

87. Plaintiff is a white male who was performing at a high level and exceeding the performance expectations of Defendants.

88.     Defendants nonetheless terminated Plaintiff for the stated purpose of replacing him with a person of a different race.

89.     Defendants' actions for the purpose of improving diversity constituted discrimination based on race.

90.     Plaintiff filed a timely complaint with the EEOC alleging discrimination.

91.     The EEOC provided Plaintiff a right to sue letter on April 19, 2023 notifying Plaintiff he had 90 days to file suit.

92.     Plaintiff seeks and is entitled to all damages recoverable, including lost wages, lost PERA retirement benefits, the cost of maintaining health insurance, and any other benefits lost from the termination.

93.     Plaintiff seeks compensatory damages.

94.     Plaintiff seeks punitive damages, as Defendants acted with malice toward Plaintiff, as shown by the false, reckless, and defamatory statements made during a City Council meeting and the reckless indifference to the violation of his rights under Title VII.

95.     Plaintiff also seeks reasonable attorneys' fees under 42 U.S.C. § 1988 and § 2000e- 5(k).

### COUNT II – DISCRIMINATORY PRACTICES RELATING TO EMPLOYMENT

96.     Plaintiffs includes by reference all other paragraphs stated in this Complaint

97.     Defendants terminated Plaintiff on account of his race.

98.     Plaintiff is a white male who was performing his job at a satisfactory level, exceeding the performance expectations of Defendant when he was terminated, then replaced by a black male for the express purpose of increasing racial diversity, a fact City officials boasted publicly about pursuing and accomplishing as an organization.

99.     The Minnesota Legislature in Minn. Stat. Ch. 363A, the Minnesota Human Rights Act that:

> It is the public policy of this state to secure for persons in this state, freedom from discrimination:
>
> (1) in employment because of race, color, creed, religion, national origin, sex, marital status, disability, status with regard to public assistance, sexual orientation, familial status, and age…
>
> (b) Such discrimination threatens the rights and privileges of the inhabitants of this state and menaces the institutions and foundations of democracy. It is also the public policy of this state to protect all persons from wholly unfounded

charges of discrimination. Nothing in this chapter shall be interpreted as restricting the implementation of positive action programs to combat discrimination…

The opportunity to obtain employment, housing, and other real estate, and full and equal utilization of public accommodations, public services, and educational institutions without such discrimination as is prohibited by this chapter is hereby recognized as and declared to be a civil right

100. Defendants' termination of Plaintiff on account of his race directly violated the express public policy of the State of Minnesota. Thus, the termination of Plaintiff was wrongful and unlawful under state law.

101. Defendant's hiring of Mr. Green over Plaintiff was based on race. Said hiring was in violation of the express public policy of the State of Minnesota.

102. Defendant's actions constituted employment discrimination in violation of Minn. Stat. 363A.08.

103. As a result of the wrongful discharge and wrongful hiring, Plaintiff has lost wages and benefits, lost retirement benefits, ,and incurred out of pocket expenses, as well as suffered humiliation. He seeks actual and compensatory tort damages.

104. The actions of Defendants were taken and approved by the City and exhibited willful and wanton disregard for Plaintiff's rights and well-being. Such actions were contrary to the public interest and warrant exemplary or punitive damages to the extent allowed.

## COUNT III – DEFAMATION

105. Plaintiff includes by reference all other paragraphs stated in this Complaint.

106. Defendant Harris accused Plaintiff Nadeau of criminal wrong doing, racism, corruption, and interfering with the permanent chief hiring process.

107. Defendant Harris knew the statements were false.

108. Defendant Harris made the statements with the intent to prevent Plaintiff Nadeau from being named as the Chief of Police.

109. Defendant Harris's statement were with actual malice.

110. As a result of the defamatory statements, Plaintiff has lost wages and benefits, lost retirement benefits, lost future employment opportunities, and incurred out of pocket expenses, as well as suffered humiliation, shame, and embarrassment. He seeks actual and compensatory tort damages.

111. The actions of Defendant were taken and approved by the City and exhibited willful and wanton disregard for Plaintiff's rights and well-being. Such actions were contrary to the public interest and warrant exemplary or punitive damages to the extent allowed.

### COUNT IV – VIOLATION OF MINN. STAT. CHAPTER 412

112. Plaintiff includes by reference all other paragraphs stated in this Complaint.

113. Defendant Harris's actions interfered with Defendant Cruikshank or prevented the Manager from exercising judgment in the appointment of officers and employees of the administrative service of the City.

114. Defendant City failed to correct Defendant Harris's actions.

115. Plaintiff Nadeau seeks enforcement of Chapter 412 through the private attorney general statute.

116. The actions of Defendant were taken and approved by the City and exhibited willful and wanton disregard for Plaintiff's rights and well-being. Such actions were contrary to the public interest and warrant compensatory, exemplary or punitive damages to the extent allowed.

117. Plaintiff Nadeau seeks his investigatory and attorneys' fees.

### COUNT V – DUE PROCESS - 42 USC § 1983 VIOLATION

118. Plaintiff includes by reference all other paragraphs stated in this Complaint.

119. Minnesota Statutes Chapter 412 defines the hiring process in Statutory Plan B Cities.

120. Defendants intentionally violated Plaintiff's substantive and procedural due process through its hiring process.

121. Defendants acted with reckless or callous indifference to Plaintiff's federally protected civil rights.

122. Punitive damages are available against Defendants Harris and Cruikshank and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

123. Plaintiff is entitled to recover his reasonable attorneys' fees.

### COUNT VI – CIVIL CONSPIRACY OF PLAINTIFF'S CIVIL RIGHTS

124. Plaintiff includes by reference all other paragraphs stated in this Complaint.

125. Defendant Smith conspired with Defendants to ensure that Plaintiff was not hired due to Plaintiff's race.

126. Defendants did violate Plaintiff's civil rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this court:

1. That this Court find that the Defendants committed acts and omissions violating the United States Constitution, actionable under 42 U.S.C. § 1983, 42 U.S.C. § 2000e and Title VII of the Civil Rights Act;

2. Order Defendants to pay compensatory damages in excess of $75,000 to be proved at trial;

3. Order Defendants to pay punitive damages; and

4. Order Defendants to pay Plaintiffs' attorneys fees and costs; and

5. Grant such further and just relief as the Court deems necessary and proper in the public interest.

Respectfully submitted,

**KELLY & LEMMONS, P.A.**

Dated: June 30, 2023            */s/ Joseph A. Kelly*
　　　　　　　　　　　　　　　Joseph A. Kelly (#0389356)
　　　　　　　　　　　　　　　Rebecca L. Duren (#0393624)
　　　　　　　　　　　　　　　2350 Wycliff Street, #200
　　　　　　　　　　　　　　　St. Paul, MN 55114

　　　　　　　　　　　　　　　*Attorneys for Plaintiff*